[No. S087265. Aug. 9, 2001.]

Conservatorship of the Person of ROBERT WENDLAND.
ROSE WENDLAND, as Conservator, etc., Petitioner and Appellant, v.
FLORENCE WENDLAND et al., Objectors and Respondents;
ROBERT WENDLAND, Appellant.

**COUNSEL**

Law Offices of Lawrence J. Nelson and Lawrence J. Nelson for Petitioner and Appellant Rose Wendland.

Law Offices of James M. Braden, James M. Braden, James T. Diamond, Jr., and Pamela J. Sieux for Appellant Robert Wendland.

Horvitz & Levy, David S. Ettinger and Jon B. Eisenberg for Alliance of Catholic Health Care, California Healthcare Association, California Medical Association, Catholic Healthcare West, Mercy Heathcare Sacramento, San Francisco Medical Society and 43 Individual Bioethicists as Amici Curiae on behalf of all Appellants.

Margaret C. Crosby for American Civil Liberties Union as Amicus Curiae on behalf of all Appellants.

Catherine I. Hanson and Alice P. Mead for California Medical Association as Amicus Curiae on behalf of all Appellants.

Vicki Michel, Terri D. Keville, Stanton J. Price, Ila Rothschild and Cynthia Fruchtman for Los Angeles County Medical Association, Los Angeles County Bar Association Joint Committee on Biomedical Ethics and Los Angeles County Bar Association Bioethics Committee as Amici Cuirae on behalf of all Appellants.

Brown, Hall, Shore & McKinley and Janie Hickok Siess for Objectors and Respondents.

Wesley J. Smith for Coalition of Concerned Medical Professionals as Amicus Curiae on behalf of Objectors and Respondents.

Rita L. Marker for Ethics and Advocacy Task Force of the Nursing Home Action Group as Amicus Curiae on behalf of Objectors and Respondents.

McKinley & Smith, Timothy M. Smith; and James Bopp, Jr., for the National Legal Center for the Medically Dependent & Disabled, Inc., as Amicus Curiae on behalf of Objectors and Respondents.

Diane Coleman, Amy Hasbrouck; Public Interest Law Center of Philadelphia, Max Lapertosa and Stephen F. Gold for Not Dead Yet, Adapt, Self-Advocates Becoming Empowered, the ARC, Brain Injury Association, Inc., Center for Self-Determination, the Center on Human Policy at Syracuse University, the Disability Rights Center, the National Council on Independent Living, the National Spinal Cord Injury Association and TASH as Amici Curiae on behalf of Objectors and Respondent.

## OPINION

**WERDEGAR, J.**—In this case we consider whether a conservator of the person may withhold artificial nutrition and hydration from a conscious

conservatee who is not terminally ill, comatose, or in a persistent vegetative state, and who has not left formal instructions for health care or appointed an agent or surrogate for health care decisions. ██ ██ Interpreting Probate Code section 2355 in light of the relevant provisions of the California Constitution, we conclude a conservator may not withhold artificial nutrition and hydration from such a person absent clear and convincing evidence the conservator's decision is in accordance with either the conservatee's own wishes or best interest.[1]

The trial court in the case before us, applying the clear and convincing evidence standard, found the evidence on both points insufficient and, thus, denied the conservator's request for authority to withhold artificial nutrition and hydration. The Court of Appeal, which believed the trial court was required to defer to the conservator's good faith decision, reversed. We reverse the decision of the Court of Appeal.

## I. FACTS AND PROCEDURAL HISTORY

On September 29, 1993, Robert Wendland rolled his truck at high speed in a solo accident while driving under the influence of alcohol. The accident injured Robert's brain, leaving him conscious yet severely disabled, both mentally and physically, and dependent on artificial nutrition and hydration.[2] Two years later Rose Wendland, Robert's wife and conservator, proposed to direct his physician to remove his feeding tube and allow him to die. Florence Wendland and Rebekah Vinson (respectively Robert's mother and sister) objected to the conservator's decision. This proceeding arose under the provisions of the Probate Code authorizing courts to settle such disputes. (Prob. Code, §§ 2355, 2359.)[3]

Following the accident, Robert remained in a coma, totally unresponsive, for several months. During this period Rose visited him daily, often with their children, and authorized treatment as necessary to maintain his health.

---

[1]While this case was under submission following oral argument, the parties informed us the conservatee had passed away. Rather than dismissing the case as moot, we chose to retain the case for decision. We have discretion to decide otherwise moot cases presenting important issues that are capable of repetition yet tend to evade review. (E.g., *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122 [105 Cal.Rptr.2d 46, 18 P.3d 1198]; *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1011, fn. 5 [36 Cal.Rptr.2d 40, 884 P.2d 988]; *Alfredo A. v. Superior Court* (1994) 6 Cal.4th 1212, 1218-1219 [26 Cal.Rptr.2d 623, 865 P.2d 56].) This is such a case. The case raises important issues about the fundamental rights of incompetent conservatees to privacy and life, and the corresponding limitations on conservators' power to withhold life-sustaining treatment. Moreover, as this case demonstrates, these issues tend to evade review because they typically concern persons whose health is seriously impaired.

[2]At the time of these proceedings, Robert was receiving food and fluids through a PEG (percutaneous endoscopically placed gastronomy) tube.

[3]All further statutory citations are to the Probate Code, except as noted.

Robert eventually regained consciousness. His subsequent medical history is described in a comprehensive medical evaluation later submitted to the court. According to the report, Rose "first noticed signs of responsiveness sometime in late 1994 or early 1995 and alerted [Robert's] physicians and nursing staff." Intensive therapy followed. Robert's "cognitive responsiveness was observed to improve over a period of several months such that by late spring of 1995 the family and most of his health care providers agreed that he was inconsistently interacting with his environment. A video recording[4] of [Robert] in July 1995 demonstrated clear, though inconsistent, interaction with his environment in response to simple commands. At his highest level of function between February and July, 1995, Robert was able to do such things as throw and catch a ball, operate an electric wheelchair with assistance, turn pages, draw circles, draw an 'R' and perform two-step commands." For example, "[h]e was able to respond appropriately to the command 'close your eyes and open them when I say the number 3.' . . . He could choose a requested color block out of four color blocks. He could set the right peg in a pegboard. Augmented communication[5] was met with inconsistent success. He remained unable to vocalize. Eye blinking was successfully used as a communication mode for a while, however no consistent method of communication was developed."

Despite improvements made in therapy, Robert remained severely disabled, both mentally and physically.[6] The same medical report summarized his continuing impairments as follows: "severe cognitive impairment that is not possible to fully appreciate due to the concurrent motor and communication impairments . . ."; "maladaptive behavior characterized by agitation, aggressiveness and non-compliance"; "severe paralysis on the right and moderate paralysis on the left"; "severely impaired communication, without compensatory augmentative communication system"; "severe swallowing dysfunction, dependent upon non-oral enteric tube feeding for nutrition and hydration"; "incontinence of bowel and bladder"; "moderate spasticity"; "mild to moderate contractures"; "general dysphoria"; "recurrent medical illnesses, including pneumonia, bladder infections, sinusitis"; and "dental issues."

After Robert regained consciousness and while he was undergoing therapy, Rose authorized surgery three times to replace dislodged feeding

---

[4]We asked the superior court to transmit to us, and have reviewed, six videotape exhibits depicting Robert's therapy sessions.

[5]"Augmented communication" refers to communication facilitated by a so-called yes/no board, a machine that pronounces the words "yes" and "no" when corresponding buttons are touched.

[6]Counsel appointed to represent Robert (see *post*, at p. 526 et seq.) asserts that he subsequently lost the ability to perform some of the tasks mentioned above, apparently because the frequency and intensity of his therapy were reduced. These assertions, which we have no reason to doubt, do not affect our analysis.

tubes. When physicians sought her permission a fourth time, she declined. She discussed the decision with her daughters and with Robert's brother Michael, all of whom believed that Robert would not have approved the procedure even if necessary to sustain his life. Rose also discussed the decision with Robert's treating physician, Dr. Kass, other physicians, and the hospital's ombudsman, all of whom apparently supported her decision. Dr. Kass, however, inserted a nasogastric feeding tube to keep Robert alive pending input from the hospital's ethics committee.

Eventually, the 20-member ethics committee unanimously approved Rose's decision. In the course of their deliberations, however, the committee did not speak with Robert's mother or sister. Florence learned, apparently through an anonymous telephone call, that Dr. Kass planned to remove Robert's feeding tube. Florence and Rebekah applied for a temporary restraining order to bar him from so doing, and the court granted the motion ex parte.

Rose immediately thereafter petitioned for appointment as Robert's conservator. In the petition, she asked the court to determine that Robert lacked the capacity to give informed consent for medical treatment and to confirm her authority "to withdraw and/or withhold medical treatment and/or life-sustaining treatment, including, but not limited to, withholding nutrition and hydration." Florence and Rebekah (hereafter sometimes objectors) opposed the petition. After a hearing, the court appointed Rose as conservator but reserved judgment on her request for authority to remove Robert's feeding tube. The court ordered the conservator to continue the current plan of physical therapy for 60 days and then to report back to the court. The court also visited Robert in the hospital.

After the 60-day period elapsed without significant improvement in Robert's condition, the conservator renewed her request for authority to remove his feeding tube. The objectors asked the trial court to appoint independent counsel for the conservatee. The trial court declined, and the Court of Appeal summarily denied the objectors' petition for writ of mandate. We granted review and transferred the case to the Court of Appeal, which then directed the trial court to appoint counsel. (*Wendland v. Superior Court* (1996) 49 Cal.App.4th 44 [56 Cal.Rptr.2d 595].) Appointed counsel, exercising his independent judgment (see generally *Conservatorship of Drabick* (1988) 200 Cal.App.3d 185, 212-214 [245 Cal.Rptr. 840] (*Drabick*)), decided to support the conservator's decision. (Because the conservator's and appointed counsel's positions in this court are essentially identical, we will henceforth refer solely to the conservator for brevity's sake.)

The ensuing proceeding generated two decisions. In the first, the court set out the law to be applied at trial. The court found no "clear cut guidance" on

how to evaluate a conservator's proposal to end the life of a conscious conservatee who was neither terminally ill nor in a persistent vegetative state. Nevertheless, drawing what assistance it could from cases involving persistently vegetative patients (*Drabick, supra,* 200 Cal.App.3d 185; *Barber v. Superior Court* (1983) 147 Cal.App.3d 1006 [195 Cal.Rptr. 484, 47 A.L.R.4th 1] (*Barber*)), the court held the conservator would be allowed to withhold artificial nutrition and hydration only if that would be in the conservatee's best interest, taking into account any pertinent wishes the conservatee may have expressed before becoming incompetent. The court also determined the conservator would have to prove the facts justifying her decision by clear and convincing evidence. A decision by a conservator to withhold life-sustaining treatment, the court reasoned, "should be premised on no lesser showing" than that required to justify involuntary medical treatment not likely to cause death. On this point, the court drew an analogy to *Lillian F. v. Superior Court* (1984) 160 Cal.App.3d 314 [206 Cal.Rptr. 603], which requires clear and convincing evidence of a conservatee's inability to make treatment decisions as a prerequisite to involuntary electroconvulsive treatment. Finally, the court held the conservator would bear the burdens both of producing evidence and of persuasion. "[F]inding itself in uncharted territory" on this subject too, the court explained that "[w]hen a situation arises where it is proposed to terminate the life of a conscious but severely cognitively impaired person, it seems more rational . . . to ask 'why?' of the party proposing the act rather than 'why not?' of the party challenging it."

The trial generated the evidence set out above. The testifying physicians agreed that Robert would not likely experience further cognitive recovery. Dr. Kass, Robert's treating physician, testified that, to the highest degree of medical certainty, Robert would never be able to make medical treatment decisions, walk, talk, feed himself, eat, drink, or control his bowel and bladder functions. Robert was able, however, according to Dr. Kass, to express "certain desires . . . . Like if he's getting tired in therapy or if he wants to quit therapy, he's usually very adamant about that. He'll either strike out or he'll refuse to perform the task." Dr. Kobrin, Robert's neurologist, testified that Robert recognized certain caregivers and would allow only specific caregivers to bathe and help him. Both Dr. Kass and Dr. Kobrin had prescribed medication for Robert's behavioral problems. Dr. Sundance, who was retained by appointed counsel to evaluate Robert, described him as being in a "minimally conscious state in that he does have some cognitive function" and the ability to "respond to his environment," but not to "interact" with it "in a more proactive way."

On April 29, 1997, Dr. Kass asked Robert a series of questions using an augmented communications device, or "yes/no board." (See *ante,* at p. 525,

fn. 5.) After a series of questions about Robert's physical state, such as "Are you sitting up?" and "Are you lying down?" that Robert appeared to answer correctly "most times," Dr. Kass asked the following questions and received the following answers:

"Do you have pain? Yes.

"Do your legs hurt? No.

"Does your buttocks hurt? No.

"Do you want us to leave you alone? Yes.

"Do you want more therapy? No.

"Do you want to get into the chair? Yes.

"Do you want to go back to bed? No.

"Do you want to die? No answer.

"Are you angry? Yes.

"At somebody? No."

So far as Dr. Kass knew, no one had previously asked Robert the same questions. Dr. Kass acknowledged there was no way to verify whether Robert "really understood the questions or not," but "[t]he reason I asked those questions," Dr. Kass continued, "is because [Robert] was able to answer the previous questions mostly correctly. So I thought perhaps he could understand more questions." Dr. Kass believed Robert probably understood some but not all of the questions. Robert's speech pathologist, Lowana Brauer, testified generally that Robert used the augmented communications device primarily as therapy and not with enough consistency to justify leaving the device in his room for communication with other people. She did not, however, testify specifically about the interaction between Robert and Dr. Kass.

Robert's wife, brother and daughter recounted preaccident statements Robert had made about his attitude towards life-sustaining health care. Robert's wife recounted specific statements on two occasions. The first occasion was Rose's decision whether to turn off a respirator sustaining the life of her father, who was near death from gangrene. Rose recalls Robert saying: "I would never want to live like that, and I wouldn't want my children to see me like that and look at the hurt you're going through as an adult seeing your father like that." On cross-examination, Rose acknowledged Robert said on this occasion that Rose's father "wouldn't want to live like a vegetable" and "wouldn't want to live in a comatose state."

After his father-in-law's death, Robert developed a serious drinking problem. After a particular incident, Rose asked Michael, Robert's brother, to talk to him. When Robert arrived home the next day he was angry to see Michael there, interfering in what he considered a private family matter. Rose remembers Michael telling Robert: "I'm going to get a call from Rosie one day, and you're going to be in a terrible accident." Robert replied: "If that ever happened to me, you know what my feelings are. Don't let that happen to me. Just let me go. Leave me alone." Robert's brother Michael testified about the same conversation. Michael told Robert: "[Y]ou're drinking; you're going to get drunk. . . . [Y]ou're either going to go out and kill yourself or kill someone else, or you're going to end up in the hospital like a vegetable—laying in bed just like a vegetable." Michael remembers Robert saying in response, "Mike, whatever you do[,] don't let that happen. Don't let them do that to me." Robert's daughter Katie remembers him saying on this occasion that "if he could not be a provider for his family, if he could not do all the things that he enjoyed doing, just enjoying the outdoors, just basic things, feeding himself, talking, communicating, if he could not do those things, he would not want to live."

Based on all the evidence, the court issued a second decision setting out its findings of fact and conclusions of law. Specifically, the court found the conservator "ha[d] not met her duty and burden to show by clear and convincing evidence that conservatee Robert Wendland, who is not in a persistent vegetative state nor suffering from a terminal illness would, under the circumstances, want to die. Conservator has likewise not met her burden of establishing that the withdrawal of artificially delivered nutrition and hydration is commensurate with conservatee's best interests, consistent with California Law as embodied in <u>Barber</u>[, *supra*, 147 Cal.App.3d 1006] and <u>Drabick, supra</u>[, 200 Cal.App.3d 185]." Based on these findings, the court granted the objectors' motion for judgment (Code Civ. Proc., § 631.8), thus denying the conservator's request for confirmation of her proposal to withdraw treatment. The court also found the conservator had acted in good faith and would be permitted to remain in that office. Nevertheless, the court limited her powers by ordering that she would "have no authority to direct . . . [any] health care provider to remove the conservatee's life sustaining medical treatment in the form of withholding nutrition and hydration." (See Prob. Code, § 2351.)[7]

The conservator appealed this decision. The Court of Appeal reversed. In the Court of Appeal's view, "[t]he trial court properly placed the burden of

---

[7]Section 2351 authorizes the court to limit a conservator's powers. The section provides: "(a) Subject to subdivision (b), the guardian or conservator . . . has the care, custody, and control of . . . the ward or conservatee. [¶] (b) Where the court determines that it is appropriate in the circumstances of the particular conservatee, the court, in its discretion, may limit the powers and duties that the conservator would otherwise have under subdivision (a) . . . ."

producing evidence on [the conservator] and properly applied a clear and convincing evidence standard. However, the court erred in requiring [the conservator] to prove that [the conservatee], while competent, expressed a desire to die in the circumstances and in substituting its own judgment concerning [the conservatee's] best interests . . . ." Instead, the trial court's role was "merely to satisfy itself that the conservator had considered the conservatee's best interests in good faith . . . ." This limited judicial role, the Court of Appeal concluded, was mandated by section 2355, as interpreted in *Drabick, supra,* 200 Cal.App.3d 185. While acknowledging the trial court had already found the conservator had acted in good faith, the Court of Appeal nevertheless declined to enter judgment for the conservator. Instead, the court remanded to permit the objectors to present any evidence rebutting the conservator's case-in-chief. Finally, recognizing that an amended version of section 2355, effective on July 1, 2000, might "be a factor upon remand," the court determined the new law did not affect the outcome. We granted review of this decision.

## II. DISCUSSION

### A. *The Relevant Legal Principles*

The ultimate focus of our analysis must be section 2355, the statute under which the conservator has claimed the authority to end the conservatee's life and the only statute under which such authority might plausibly be found. Nevertheless, the statute speaks in the context of an array of constitutional, common law, and statutory principles. The Law Revision Commission, which drafted the statute's current version, was aware of these principles and cited them to explain and justify the proposed legislation. ■■ ■ Because these principles provide essential background, we set them out briefly here, followed by the history of the statute.[8]

### 1. *Constitutional and common law principles*

■ One relatively certain principle is that a competent adult has the right to refuse medical treatment, even treatment necessary to sustain life. The Legislature has cited this principle to justify legislation governing medical care decisions (§ 4650), and courts have invoked it as a starting point for

---

[8] The current version of section 2355 governs this case. It took effect on July 1, 2000, and defines the powers of conservators in California from that day forward. A trial court's order limiting a conservator's powers, like an injunction, defines the rights of the parties in the future and is subject to modification based on changes in the law. In such a case, a reviewing court applies the law in effect at the time it renders its opinion. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1008 [90 Cal.Rptr.2d 236, 987 P.2d 705]; *Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 527-528 [45 P.2d 972].)

analysis, even in cases examining the rights of incompetent persons and the duties of surrogate decision makers (e.g., *Drabick, supra,* 200 Cal.App.3d 185, 206; *Barber, supra,* 147 Cal.App.3d 1006, 1015). This case requires us to look beyond the rights of a competent person to the rights of incompetent conservatees and the duties of conservators, but the principle just mentioned is a logical place to begin.

That a competent person has the right to refuse treatment is a statement both of common law and of state constitutional law. In its common law form, the principle is often traced to *Union Pacific Railway Co. v. Botsford* (1891) 141 U.S. 250, 251 [11 S.Ct. 1000, 1001, 35 L.Ed. 734], in which the United States Supreme Court wrote that "[n]o right is held more sacred, or is more carefully guarded, by .the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Applying this principle, the high court held that the plaintiff in a personal injury case was not required to submit to a surgical examination intended to reveal the extent of her injuries. (*Ibid.*) Courts in subsequent cases relied on the same principle to award damages for operations performed without the patient's consent. The landmark case is *Schloendorff v. Society of New York Hospital* (1914) 211 N.Y. 125 [105 N.E. 92, 93], in which Judge Cardozo wrote that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." We adopted this principle in *Cobbs v. Grant* (1972) 8 Cal.3d 229, 242 [104 Cal.Rptr. 505, 502 P.2d 1], adding that "the patient's consent to treatment, to be effective, must be an informed consent." Most recently, in *Thor v. Superior Court* (1993) 5 Cal.4th 725 [21 Cal.Rptr.2d 357, 855 P.2d 375], we held that the common law right of a competent adult to refuse life-sustaining treatment extends even to a state prisoner; we thus absolved prison officials and medical personnel of any duty to provide artificial hydration and nutrition against the will of a quadriplegic prisoner who needed such treatment to survive.

The Courts of Appeal have found another source for the same right in the California Constitution's privacy clause. (Cal. Const., art. I, § 1.) The court in *Bartling v. Superior Court* (1984) 163 Cal.App.3d 186 [209 Cal.Rptr. 220] held that a competent adult with serious, probably incurable illnesses was entitled to have life-support equipment disconnected over his physicians' objection even though that would hasten his death. "The right of a competent adult patient to refuse medical treatment," the court explained, "has its origins in the constitutional right of privacy. This right is specifically guaranteed by the California Constitution (art. I, § 1) . . . . . The constitutional right of privacy guarantees to the individual the freedom to choose to

reject, or refuse to consent to, intrusions of his bodily integrity." (*Id.* at p. 195.) To the same effect is the decision in *Bouvia v. Superior Court* (1986) 179 Cal.App.3d 1127 [225 Cal.Rptr. 297], in which the court directed injunctive relief requiring a public hospital to comply with a competent, terminally ill patient's direction to remove a nasogastric feeding tube. "The right to refuse medical treatment," the court wrote, "is basic and fundamental. . . . Its exercise requires no one's approval. It is not merely one vote subject to being overridden by medical opinion." (*Id.* at p. 1137; see also *Rains v. Belshé* (1995) 32 Cal.App.4th 157, 169 [38 Cal.Rptr.2d 185], *Drabick, supra,* 200 Cal.App.3d 185, 206, fn. 20, *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 540 [223 Cal.Rptr. 746], *Foy v. Greenblott* (1983) 141 Cal.App.3d 1, 11 [190 Cal.Rptr. 84] [all describing, albeit perhaps in dictum, the competent person's right to refuse medical treatment as protected by the state constitutional right to privacy].)

In *Thor v. Superior Court, supra,* 5 Cal.4th 725, as mentioned, we based our conclusion that a prisoner had the right to refuse life-sustaining treatment solely on the common law without also considering whether the state Constitution provided similar protection. But *Thor* does not reject the state Constitution as a basis for the right. More importantly, we have since *Thor* determined that the privacy clause does protect the fundamental interest in personal autonomy. "Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 34 [26 Cal.Rptr.2d 834, 865 P.2d 633]; see also *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 340 [66 Cal.Rptr.2d 210, 940 P.2d 797] [reaffirming *Hill* and adding to its list of " 'obvious invasion[s] of . . . interest[s] fundamental to personal autonomy' " (italics omitted) a law interfering with the decision whether to bear a child].) In comparison with these examples, the competent adult's decision to refuse life-sustaining medical treatment must also be seen as fundamental.

Federal law has little to say about the competent person's right to refuse treatment, but what it does say is not to the contrary. The United States Supreme Court spoke provisionally to the point in *Cruzan v. Director, Missouri Dept. of Health* (1990) 497 U.S. 261 [110 S.Ct. 2841, 111 L.Ed.2d 224] (*Cruzan*). At issue was the constitutionality of a Missouri law permitting a conservator to withhold artificial nutrition and hydration from a conservatee in a persistent vegetative state only upon clear and convincing evidence that the conservatee, while competent, had expressed the desire to refuse *such treatment.* The court concluded the law was constitutional. While

the case thus did not present the issue, the court nevertheless acknowledged that "a competent person['s] . . . constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred" (*id.* at p. 278 [110 S.Ct. at p. 2851]) from prior decisions holding that state laws requiring persons to submit to involuntary medical procedures must be justified by countervailing state interests. The "logic" of such cases would, the court thought, implicate a competent person's liberty interest in refusing artificially delivered food and water essential to life. (*Id.* at p. 279 [110 S.Ct. at pp. 2851-2852].) Whether any given state law infringed such a liberty interest, however, would have to be determined by balancing the liberty interest against the relevant state interests, in particular the state's interest in preserving life. (*Id.* at p. 280 [110 S.Ct. at p. 2852].)

In view of these authorities, the competent adult's right to refuse medical treatment may be safely considered established, at least in California.

The same right survives incapacity, in a practical sense, if exercised while competent pursuant to a law giving that act lasting validity. For some time, California law has given competent adults the power to leave formal directions for health care in the event they later become incompetent; over time, the Legislature has afforded ever greater scope to that power. The former Natural Death Act (Health & Saf. Code, former § 7185 et seq., added by Stats. 1976, ch. 1439, § 1, p. 6478, and repealed by Stats. 1991, ch. 895, § 1, p. 3973), as first enacted in 1976, authorized competent adults to direct health care providers to withhold or withdraw life-sustaining procedures under very narrow circumstances only: specifically, in the event of an incurable condition that would cause death regardless of such procedures and where such procedures would serve only to postpone the moment of death. In findings accompanying the law, the Legislature expressly found "that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care" (*id.*, § 7186) and explained the law as giving lasting effect to that right: "In recognition of the dignity and privacy which patients have a right to expect, the Legislature hereby declares that the laws of the State of California shall recognize the right of an adult person to make a written directive instructing his physician to withhold or withdraw life-sustaining procedures in the event of a terminal condition." (*Ibid.*) In 1991, the Legislature amended the law to permit competent adults to refuse, in advance, life-sustaining procedures in the event of a "permanent unconscious condition," defined as an "irreversible coma or persistent vegetative state." (Health & Saf. Code, former §§ 7185.5, 7186, subd. (e), added by Stats. 1991, ch. 895, § 2, pp. 3974-3975, and repealed by Stats. 1999, ch. 658, § 7.) Intervening legislation also enabled a competent adult to execute a durable power of attorney authorizing an agent

to "withhold[] or withdraw[] . . . health care . . . so as to permit the natural process of dying," and to make other health care decisions, in the event of the principal's incompetence. (Civ. Code, former § 2443, added by Stats. 1983, ch. 1204, § 10, p. 4622, and repealed by Stats. 1994, ch. 307, § 7, p. 1982.)

Effective July 1, 2000, the Health Care Decisions Law (Stats. 1999, ch. 658) gives competent adults extremely broad power to direct all aspects of their health care in the event they become incompetent. The new law, which repeals the former Natural Death Act and amends the durable power of attorney law, draws heavily from the Uniform Health-Care Decisions Act adopted in 1993 by the National Conference of Commissioners on Uniform State Laws. (See 2000 Health Care Decisions Law and Revised Power of Attorney Law (Mar. 2000) 30 Cal. Law Revision Com. Rep. (2000) p. 49 [preprint copy].) Briefly, and as relevant here, the new law permits a competent person to execute an advance directive about "any aspect" of health care. (§ 4701.) Among other things, a person may direct that life-sustaining treatment be withheld or withdrawn under conditions specified by the person and not limited to terminal illness, permanent coma, or persistent vegetative state. A competent person may still use a power of attorney for health care to give an agent the power to make health care decisions (§ 4683), but a patient may also orally designate a surrogate to make such decisions by personally informing the patient's supervising health care provider. (§ 4711.) Under the new law, agents and surrogates are required to make health care decisions "in accordance with the principal's individual health care instructions, if any, and other wishes to the extent known to the agent." (§ 4684; see also § 4711.)

All of the laws just mentioned merely give effect to the decision of a competent person, in the form either of instructions for health care or the designation of an agent or surrogate for health care decisions. Such laws may accurately be described, as the Legislature has described them, as a means to respect personal autonomy by giving effect to competent decisions: "In recognition of the dignity and privacy a person has a right to expect, the law recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn." (§ 4650, subd. (a) [legislative findings].) This court made essentially the same point in *Thor v. Superior Court, supra,* 5 Cal.4th 725, 740, where we described "the [former] Natural Death Act and other statutory provisions permitting an individual or designated surrogate to exercise conclusive control over the administration of life-sustaining treatment [as] evidenc[ing] legislative recognition that

fostering self-determination in such matters enhances rather than deprecates the value of life."

In contrast, decisions made by conservators typically derive their authority from a different basis—the *parens patriae* power of the state to protect incompetent persons. Unlike an agent or a surrogate for health care, who is voluntarily appointed by a competent person, a conservator is appointed by the court because the conservatee "has been adjudicated to lack the capacity to make health care decisions." (§ 2355, subd. (a).) In 1988, the court in *Drabick, supra,* 200 Cal.App.3d 185, confused these two distinct concepts— the voluntary act of a competent person and the state's *parens patriae* power—and on that questionable basis took to a novel conclusion the idea that a person's right to refuse treatment survives incompetence. *Drabick* figures prominently both in the legislative history of section 2355—the statute governing this case—and the parties' arguments. It therefore deserves close attention.

At issue in *Drabick, supra,* 200 Cal.App.3d 185, was a conservator's proposal to end the life of a conservatee by removing a nasogastric feeding tube. The formerly competent conservatee had been unconscious for five years in a persistent vegetative state; physicians opined he would never regain consciousness. While the conservatee had expressed informally his desire not to be kept alive by artificial life support systems, he had not left formal directions for his health care. Former section 2355, subdivision (a) (added by Stats. 1979, ch. 726, § 3, pp. 2379-2380, and repealed by Stats. 1990, ch. 79, § 13, p. 463) gave the conservator "exclusive authority to give consent for such medical treatment . . . as the conservator in good faith based on medical advice determines to be necessary." The court construed this language as also giving the conservator, "by necessary implication, . . . power to withhold or withdraw consent to medical treatment under appropriate circumstances." (*Drabick, supra,* at p. 200.) Treatment to sustain the life of a permanently unconscious person was not " 'necessary' " within the meaning of former section 2355, the court reasoned, "if it offers no reasonable possibility of returning the conservatee to cognitive life and if it is not otherwise in the conservatee's best interests, as determined by the conservator in good faith." (*Drabick, supra,* at p. 218.)

Counsel appointed to represent the conservatee in *Drabick, supra,* 200 Cal.App.3d 185, argued that the state's interest in preserving life justified the court in limiting the conservator's powers. The court disagreed. Rather than presenting a conflict between the conservator's decision to terminate life support and the state's interest in preserving life, the *Drabick* court thought the case was more appropriately viewed as presenting a conflict

between two rights belonging to the conservatee: "Both the fundamental right to life—to continue receiving treatment—and the right to terminate unwanted treatment deserve consideration. Someone acting in [the conservatee's] best interests can and must choose between them." (*Id.* at p. 210.) Viewing the case in this way, the court was "convinced that [it would] deprive [the conservatee] of a fundamental right" were it to bar the conservator from withholding treatment. (*Id.* at p. 208.) The court candidly acknowledged that "to claim [a permanently unconscious conservatee's] 'right to choose' survives incompetence is a legal fiction at best." (*Ibid.*) Indeed, such a person's "noncognitive state prevents him from choosing anything." (*Ibid.*) Nevertheless, the court concluded, "incompetence does not cause the loss of a fundamental right from which the incompetent person can still benefit" through its vicarious exercise by a conservator. (*Ibid.*) As precedent for this analysis, the *Drabick* court relied on *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143 [219 Cal.Rptr. 387, 707 P.2d 760], in which this court held unconstitutional a statute (§ 2356, subd. (d)) barring use of the conservator's statutory powers to authorize sterilization of wards and conservatees. Just as this court in *Valerie N.* permitted conservators of developmentally disabled women to exercise vicariously their conservatees' right to choose sterilization, the *Drabick* court explained, the conservator of a persistently vegetative conservatee may exercise vicariously the conservatee's right to refuse medical treatment. (*Drabick, supra,* at pp. 207-208.)[9]

---

[9]To the extent the court in *Drabick, supra,* 200 Cal.App.3d 185, relied on the rights of the incompetent conservatee to justify the conservator's decision to end his life, federal law offers the decision no support. In *Cruzan, supra,* 497 U.S. 261, the United States Supreme Court considered the rationale employed in *Drabick* and declined to adopt it. After setting out the essential rationale of *Drabick* and similar cases (*Cruzan, supra,* at pp. 270-277 [110 S.Ct. at pp. 2847-2851]), the court summarized its own understanding of the matter as follows: "An incompetent person," the court wrote, "is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment or any other right. Such a 'right' must be exercised for her, if at all, by some sort of surrogate. Here, Missouri has in effect recognized that under certain circumstances a surrogate may act for the patient in electing to have hydration and nutrition withdrawn in such a way as to cause death, but it has established a procedural safeguard to assure that the action of the surrogate conforms as best it may to the wishes expressed by the patient while competent. Missouri requires that evidence of the incompetent's wishes as to the withdrawal of treatment be proved by clear and convincing evidence. The question, then, is whether the United States Constitution forbids the establishment of this procedural requirement by the State. We hold that it does not." (*Id.* at p. 280 [110 S.Ct. at p. 2852].)

The court in *Cruzan, supra,* 497 U.S. 261, also rejected the argument that Missouri's law violated the equal protection clause by treating competent persons differently than incompetent ones in the matter of refusing medical treatment—a point recalling the *Drabick* court's premise that courts must permit an individual's right to refuse treatment to survive his or her incompetence in order to prevent its loss. Rejecting the argument, the high court explained that "[t]he differences between the choice made *by* a competent person to refuse medical treatment, and the choice made *for* an incompetent person by someone else to refuse medical

Having expressly recognized the "fiction[al]" aspect of its analysis (*Drabick, supra*, 200 Cal.App.3d 185, 208), and seeking perhaps to place its conclusion on firmer ground, the court in *Drabick* offered this alternative rationale: "In the years since the [*Matter of*] *Quinlan* [(1976) [70 N.J. 10 [355 A.2d 647, 79 A.L.R.3d 205]] decision," the *Drabick* court wrote, "most courts have adopted the formula that a patient's 'right to choose' or 'right to refuse' medical treatment survives incompetence. It would be more accurate to say that incompetent patients retain the right to have appropriate medical decisions made on their behalf. An appropriate medical decision is one that is made in the patient's best interests, as opposed to the interests of the hospital, the physicians, the legal system, or someone else." (*Id.* at p. 205.) We do not question the *Drabick* court's conclusion that incompetent persons have a right, based in the California Constitution, to appropriate medical decisions that reflect their *own* interests and values. (*Drabick, supra*, at p. 205.) But the right to an appropriate decision by a court-appointed conservator does not necessarily equate with the conservatee's right to refuse treatment, or obviously take precedence over the conservatee's right to life or the state's interest in preserving life.

No published decision in this state has rejected the *Drabick* court's conclusions. Seven months after *Drabick*, the court in *Conservatorship of Morrison* (1988) 206 Cal.App.3d 304, 308-309 [253 Cal.Rptr. 530] viewed *Drabick* as having settled the question whether former section 2355 empowered a conservator to end the life of a persistently vegetative conservatee by withholding artificial nutrition and hydration. But neither, until the decision presently on review, has the holding in *Drabick* been extended to cases involving conservatees other than those in persistent vegetative states. This, almost certainly, is because the *Drabick* court strictly limited its decision to such persons. The "opinion's reasoning," the court wrote, "is predicated upon its subject being a patient for whom there is no reasonable hope of a return to cognitive life. We have not considered any other case, and this opinion would not support a decision to forego treatment if this factual predicate could not be satisfied." (*Drabick, supra*, 200 Cal.App.3d 185, 217, fn. 36.) Although the court did not explain how its reasoning was predicated on the conservatee's permanently unconscious state, the decision's self-imposed limitation avoids or mitigates a serious constitutional problem: A person whose permanent unconsciousness prevents him from perceiving that artificial hydration and nutrition are being withdrawn arguably has a more attenuated interest in avoiding that result than a person who may consciously perceive the effects of dehydration and starvation.

treatment, are so obviously different that the State is warranted in establishing rigorous procedures for the latter class of cases which do not apply to the former class." (*Cruzan, supra*, at p. 287, fn. 12 [110 S.Ct. at p. 2856].)

## 2. *Section 2355*

The ultimate focus of our analysis, as mentioned at the outset, must be section 2355, the statute under which the conservator claims the authority to end the conservatee's life. The statute's history indicates that the Law Revision Commission, which drafted the current version, was aware of and intended to incorporate some, but not all, of the *Drabick* (*supra*, 200 Cal.App.3d 185) court's construction of the former statute.

As originally enacted in 1979, and at the time the lower courts ruled in this case, section 2355 provided: "If the conservatee has been adjudicated to lack the capacity to give informed consent for medical treatment, the conservator has the exclusive authority to give consent for such medical treatment to be performed on the conservatee as the conservator in good faith based on medical advice determines to be necessary and the conservator may require the conservatee to receive such medical treatment, whether or not the conservatee objects." (Former § 2355, subd. (a), added by Stats. 1979, ch. 726, § 3, pp. 2379-2380, repealed and reenacted without change by Stats. 1990, ch. 79, § 14, p. 575 [enacting new Probate Code].)

This language arguably was broad enough to cover the entire range of medical decisions a conservator might be called upon to make. Historical evidence is lacking, however, that the Legislature in 1979 actually contemplated that the statute would be understood as authorizing a conservator to deliberately end the life of a conservatee by withholding artificially delivered food and water. Such authority, if it indeed existed, would have been merely implicit, as a consequence of the statute's broad language. The claim that section 2355 conferred that authority was first considered and accepted in 1988 by the court in *Drabick, supra,* 200 Cal.App.3d 185. (See *ante,* p. 535 et seq.)

The *Drabick* court also read former section 2355 as severely restricting the role of courts in supervising conservators' treatment decisions. "[W]e do not believe," the court wrote, "that it is the [trial] court's role to substitute its judgment for the conservator's. Instead, when the conservator or another interested person has requested the court's approval the court should confine its involvement to ensuring that the conservator has made the type of decision for which the Probate Code expressly calls: a 'good faith' decision 'based on medical advice' whether treatment is 'necessary.' " (*Drabick, supra,* 200 Cal.App.3d 185, 200, quoting former § 2355.) The required decision, the court explained, is the *conservator's* assessment of the conservatee's best interests. While acknowledging that the conservator would be bound by the conservatee's formal health care directions in a durable power

of attorney or living will (*Drabick, supra,* at p. 211, fn. 28), the court rejected "the different idea . . . that [the conservatee's] own prior *informal* statements *compel* either the continuation or cessation of treatment in a particular case." (*Id.* at p. 210, first italics added.) Instead, "the conservatee's prior statements [merely] inform the decision of the conservator, who must vicariously exercise the conservatee's rights. Such statements do not in themselves amount to the exercise of a right. The statute gives the conservator the exclusive authority to exercise the conservatee's rights, and it is the conservator who must make the final treatment decision regardless of how much or how little information about the conservatee's preferences is available. There is no necessity or authority," the court concluded, "for adopting a rule to the effect that the conservatee's desire to have medical treatment withdrawn must be proved by clear and convincing evidence or another standard. Acknowledging that the patient's expressed preferences are relevant, it is enough for the conservator, who must act in the conservatee's best interests, to consider them in good faith." (*Id.* at pp. 211-212, fn. omitted.)

In 1990, the Legislature repealed and reenacted former section 2355 without change while reorganizing the Probate Code. But in 1999, section 2355 changed significantly with the Legislature's adoption of the Health Care Decisions Law (§ 4600 et seq., added by Stats. 1999, ch. 658). That law took effect on July 1, 2000, about four months after the Court of Appeal filed the opinion on review. Many of the new law's provisions, as already noted, are the same as, or drawn from, the Uniform Health-Care Decisions Act. (See 30 Cal. Law Revision Com. Rep., *supra,* p. 49.) Section 2355, as a statute addressing medical treatment decisions, was revised to conform to the new law.

The main purpose of the Health Care Decisions Law is to provide "procedures and standards" governing "health care decisions to be made for adults at a time when they are incapable of making decisions on their own and [to] provide[] mechanisms for directing their health care in anticipation of a time when they may become incapacitated." (30 Cal. Law Revision Com. Rep., *supra,* p. 6.) The core provision of the new law, which comes directly from the Uniform Health-Care Decisions Act, sets out uniform standards for the making of health care decisions by third parties. The language embodying this core provision now appears in statutes governing decisions by conservators (§ 2355), agents (§ 4684), and surrogates (§ 4714). This language is set out below in italics, as it appears in the context of section 2355: "If the conservatee has been adjudicated to lack the capacity to make health care decisions, the conservator has the exclusive authority to make health care decisions for the conservatee that the conservator in good

faith based on medical advice determines to be necessary. *The conservator shall make health care decisions for the conservatee in accordance with the conservatee's individual health care instructions, if any, and other wishes to the extent known to the conservator. Otherwise, the conservator shall make the decision in accordance with the conservator's determination of the conservatee's best interest. In determining the conservatee's best interest, the conservator shall consider the conservatee's personal values to the extent known to the conservator.* The conservator may require the conservatee to receive the health care, whether or not the conservatee objects. In this case, the health care decision of the conservator alone is sufficient and no person is liable because the health care is administered to the conservatee without the conservatee's consent. For the purposes of this subdivision, 'health care' and 'health care decision' have the meanings provided in Sections 4615 and 4617, respectively." (§ 2355, subd. (a), as amended by Stats. 1999, ch. 658, § 12, italics added.)

The last sentence of section 2355, subdivision (a), set out above, incorporates definitional provisions of the Health Care Decisions Law. Of these, section 4615 defines " '[h]ealth care' " as "any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect a patient's physical or mental condition." Section 4617 defines " '[h]ealth care decision' " as "a decision made by a patient or the patient's agent, conservator, or surrogate, regarding the patient's health care, including the following: [¶] (a) Selection and discharge of health care providers and institutions. [¶] (b) Approval or disapproval of diagnostic tests, surgical procedures, and programs of medication. [¶] (c) Directions to provide, *withhold, or withdraw artificial nutrition and hydration* and all other forms of health care, including cardiopulmonary resuscitation." (Italics added.)

These revisions to section 2355, like the remainder of the Health Care Decisions Law, were drafted by the Law Revision Commission. In its official comment to section 2355, the commission wrote that subdivision (a), as amended, "is consistent with . . . *Drabick,* [*supra,* 200] Cal.App.3d 185 . . . ." (30 Cal. Law Revision Com. Rep., *supra,* com. to § 2355, p. 263.) In the comment, the commission also set out important passages from the *Drabick* opinion, presumably as indicative of the drafters' intent. Indeed, the new law is consistent with *Drabick* in recognizing the power of conservators to refuse consent to health care, even health care necessary to sustain life, and in treating the decision to withhold artificial nutrition and hydration as a health care decision.

In other respects, the current version of section 2355 departs from the decision in *Drabick, supra,* 200 Cal.App.3d 185. The *Drabick* court viewed

the informally expressed wishes of the incompetent conservatee simply as a factor for the conservator to consider in determining the conservatee's best interest. (*Id.* at pp. 211-212.) In contrast to *Drabick*, section 2355 assigns dispositive weight to the conservatee's informally expressed wishes, when known. Under the statute, "[t]he conservator shall make health care decisions for the conservatee in accordance with the conservatee's individual health care instructions, if any, and other wishes to the extent known to the conservator." (§ 2355, subd. (a).) The best interest standard applies only when the conservatee's wishes are not known, as a fallback standard embodied in the statute's next sentence: "Otherwise, the conservator shall make the decision in accordance with the conservator's determination of the conservatee's best interest. In determining the conservatee's best interest, the conservator shall consider the conservatee's personal values to the extent known to the conservator." (*Ibid.*)

### B. *The Present Case*

This background illuminates the parties' arguments, which reduce in essence to this: The conservator has claimed the power under section 2355, as she interprets it, to direct the conservatee's health care providers to cease providing artificial nutrition and hydration. In opposition, the objectors have contended the statute violates the conservatee's rights to privacy and life under the facts of this case if the conservator's interpretation of the statute is correct.[10]

A few points of the conservator's argument may be taken for granted. Certainly the "health care decisions" that section 2355 empowers a conservator to make include, under appropriate circumstances, the decision "to provide, withhold, or withdraw artificial nutrition and hydration and all other forms of health care . . . ." (§ 4617, subd. (c).) Section 4617, which defines "health care decisions" for purposes of section 2355, says precisely that. Furthermore, as the conservator also argues, the conditions under which such a decision might be appropriate must be determined by reference to the

---

[10]The conservator argues that a conservator's decision to withdraw life support does not entail state action and, thus, cannot implicate the conservatee's constitutional rights. State action, however, is of no concern because the state constitutional right to privacy (Cal. Const., art. I, § 1), one of the traditional sources of a patient's right to autonomy and bodily integrity, protects against private conduct and is sufficiently broad to justify our conclusion. (*Hill v. National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th 1, 16-20; see also *American Academy of Pediatrics v. Lungren*, *supra*, 16 Cal.4th 307, 326-327.) A conservatee's right to life (Cal. Const., art. I, § 1), which coincides here with the state's interest in protecting life, also supports the conclusion and enjoys some protection against private conduct, as illustrated by the laws prohibiting homicide and expressing legislative disapproval of mercy killing, assisted suicide, and euthanasia (§ 4653). (Cf. *Cruzan*, *supra*, 497 U.S. 261, 280 [110 S.Ct. 2841, 2852].)

standards for decisionmaking set out in section 2355. The next step in the analysis is to apply the dual standard set out in section 2355 to the facts of the case.

### 1. *The primary standard: a decision in accordance with the conservatee's wishes*

The conservator asserts she offered sufficient evidence at trial to satisfy the primary statutory standard, which contemplates a decision "in accordance with the conservatee's . . . wishes . . . ." (§ 2355, subd. (a).) The trial court, however, determined the evidence on this point was insufficient. The conservator did "not [meet] her duty and burden," the court expressly found, "to show by clear and convincing evidence that [the] conservatee . . . , who is not in a persistent vegetative state nor suffering from a terminal illness would, under the circumstances, want to die." To be sure, the court made this finding under former section 2355 rather than the current version—and not because the former statute expressly called for such a finding but under the belief that case law required it. (See *ante,* at p. 526-527.) But the finding's relevance under the new statute cannot easily be dismissed: The new statute expressly requires the conservator to follow the conservatee's wishes, if known. (§ 2355, subd. (a).)

The conservator argues the Legislature understood and intended that the low preponderance of the evidence standard would apply. Certainly this was the Law Revision Commission's understanding. On this subject, the commission wrote: "[Section 2355] does not specify any special evidentiary standard for the determination of the conservatee's wishes or best interest. Consequently, the general rule applies: the standard is by preponderance of the evidence. Proof is not required by clear and convincing evidence." (30 Cal. Law Revision Com. Rep., *supra,* p. 264.) ■ We have said that "[e]xplanatory comments by a law revision commission are persuasive evidence of the intent of the Legislature in subsequently enacting its recommendations into law." (*Brian W. v. Superior Court* (1978) 20 Cal.3d 618, 623 [143 Cal.Rptr. 717, 574 P.2d 788].) Nevertheless, one may legitimately question whether the Legislature can fairly be assumed to have read and endorsed every statement in the commission's 280-page report on the Health Care Decisions Law. (Cf. *Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 250 [66 Cal.Rptr. 20, 437 P.2d 508] [describing the inference of legislative approval as strongest when the commission's comment is brief].)

■ The objectors, in opposition, argue that section 2355 would be unconstitutional if construed to permit a conservator to end the life of a conscious conservatee based on a finding by the low preponderance of the

evidence standard that the latter would not want to live. We see no basis for holding the statute unconstitutional on its face. We do, however, find merit in the objectors' argument. We therefore construe the statute to minimize the possibility of its unconstitutional application by requiring clear and convincing evidence of a conscious conservatee's wish to refuse life-sustaining treatment when the conservator relies on that asserted wish to justify withholding life-sustaining treatment. This construction does not entail a deviation from the language of the statute and constitutes only a partial rejection of the Law Revision Commission's understanding that the preponderance of the evidence standard would apply; we see no constitutional reason to apply the higher evidentiary standard to the majority of health care decisions made by conservators not contemplating a conscious conservatee's death. Our reasons are as follows:

At the time the Legislature was considering the present version of section 2355, no court had interpreted any prior version of the statute as permitting a conservator deliberately to end the life of a *conscious* conservatee. Even today, only the decision on review so holds. The court in *Drabick, supra,* 200 Cal.App.3d 185, as we have seen, found sufficient authority in the statute to confirm a conservator's decision that artificial hydration and nutrition was not in the best interest of a *permanently unconscious, persistently vegetative conservatee*. The *Drabick* court, however, expressly limited its decision to cases involving conservatees in the same medical condition and stated that its reasoning was, in some unexplained way, predicated on such facts. (*Id.* at p. 217, fn. 36.) While the conservator embraces *Drabick* in other respects, the authoring court, she writes, "was flat-out wrong to limit the applicability of [section] 2355, of its statutory analysis, and of its constitutional insights to permanently unconscious conservatees as these limitations ignore the plain language of the statute as well as logic." To the contrary, by limiting its decision in this way the *Drabick* court thereby avoided the constitutional problem we confront here, namely, the propriety of a decision to withhold artificial nutrition and hydration from a conscious conservatee who, while incompetent, may nevertheless subjectively perceive the effects of dehydration and starvation. (See *ante,* at p. 537.)

In amending section 2355 in 1999, neither the Legislature, nor the Law Revision Commission in its official report to the Legislature, alluded to the possibility that the statute might be invoked to justify withholding artificial nutrition and hydration from a conscious patient. The conservator sees evidence of specific legislative authority for such a decision in the findings that accompanied the Health Care Decisions Law, but we do not. These findings, which first entered California law as part of the former Natural Death Act (Health & Saf. Code, former § 7185.5; see *ante,* at p. 533), were

revised and recodified in the new legislation as Probate Code section 4650.[11] The Law Revision Commission in its report accurately explained the proposed change in the findings as follows: "The earlier legislative findings were limited to persons with a terminal condition or permanent unconscious condition. This restriction is not continued here in recognition of the broader scope of this division and the development of case law since enactment of the original Natural Death Act in 1976." (30 Cal. Law Revision Com. Rep., *supra*, p. 61.) From this history, the conservator deduces that the commission, and by inference the Legislature, intended to give conservators the power she has sought in this case to end a conscious conservatee's life. Considering, however, the subject's importance and potentially controversial nature, it seems extremely unlikely that the Legislature intended to regulate the subject through the deletion of a few limiting words from a legislative finding. In any event, the commission's reference to "the broader scope" (*ibid.*) of the new law more plausibly refers simply to the fact that the new law, unlike the former Natural Death Act, permits a *competent* person to provide by advance directive for virtually all aspects of his or her future health care rather than, as previously, simply the withdrawal of life support under narrowly circumscribed facts. (See *ante*, at p. 534.) Certainly the commission's reference to "the development of case law" since 1976 cannot be understood as suggesting that conservators may end the life of conscious patients. At the time the commission wrote, no California case had addressed the subject. Moreover, of the four cases the commission cites, two involved competent patients (*Bouvia v. Superior Court, supra*, 179 Cal.App.3d 1127; *Bartling v. Superior Court, supra*, 163 Cal.App.3d 186), and two concerned patients in persistent vegetative states (*Drabick, supra*, 200 Cal.App.3d 185; *Barber, supra*, 147 Cal.App.3d 1006); none involved withdrawal of life support from a conscious but incompetent patient. One also finds in the commission's lengthy report, albeit in a different comment, the cryptic statement that the amended version of section 2355 is "consistent with . . . *Drabick.*" (30 Cal. Law Revision Com. Rep., *supra*, com. to § 2355, p. 263.) But *Drabick* was expressly limited to patients in persistent vegetative states.

---

[11]Section 4650, in full, currently provides as follows:

"The Legislature finds the following:

"(a) In recognition of the dignity and privacy a person has a right to expect, the law recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn.

"(b) Modern medical technology has made possible the artificial prolongation of human life beyond natural limits. In the interest of protecting individual autonomy, this prolongation of the process of dying for a person for whom continued health care does not improve the prognosis for recovery may violate patient dignity and cause unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the person.

"(c) In the absence of controversy, a court is normally not the proper forum in which to make health care decisions, including decisions regarding life-sustaining treatment."

(*Drabick, supra*, 200 Cal.App.3d 185, 217, fn. 36.) Consistency with *Drabick* on this point does not support the conservator's position. For all these reasons, we are not convinced the Legislature gave any consideration to the particular problem before us in this case. The prefatory note and comments to the Uniform Health-Care Decisions Act are also silent on the point.

Notwithstanding the foregoing, one must acknowledge that the primary standard for decisionmaking set out in section 2355 does articulate what will in some cases form a constitutional basis for a conservator's decision to end the life of a conscious patient: deference to the patient's own wishes. This standard also appears in the new provisions governing decisions by agents and surrogates designated by competent adults. (§§ 4684, 4714.) As applied in that context, the requirement that decisions be made "in accordance with the principal's individual health care instructions . . . and other wishes" (§ 4684) merely respects the principal-agent relationship and gives effect to the properly expressed wishes of a competent adult. Because a competent adult may refuse life-sustaining treatment (see *ante*, at p. 530 et seq.), it follows that an agent properly and voluntarily designated by the principal may refuse treatment on the principal's behalf unless, of course, such authority is revoked. (See, e.g., §§ 4682, 4689, 4695 [providing various ways in which the authority of an agent for health care decisions may be revoked or the agent's instructions countermanded].)

The only apparent purpose of requiring conservators to make decisions in accordance with the conservatee's wishes, when those wishes are known, is to enforce the fundamental principle of personal autonomy. The same requirement, as applied to agents and surrogates freely designated by competent persons, enforces the principles of agency. A reasonable person presumably will designate for such purposes only a person in whom the former reposes the highest degree of confidence. A conservator, in contrast, is *not* an agent of the conservatee, and unlike a freely designated agent cannot be presumed to have special knowledge of the conservatee's health care wishes. A person with "sufficient capacity . . . to form an intelligent preference" may nominate his or her own conservator (§ 1810), but the nomination is not binding because the appointment remains "solely in the discretion of the court" (§ 1812, subd. (a)). Furthermore, while statutory law gives preference to spouses and other persons related to the conservatee (*id.*, subd. (b)), who might know something of the conservatee's health care preferences, the law also permits the court in its sole discretion to appoint unrelated persons and even public conservators (*ibid.*). While it may be constitutionally permissible to assume that an agent freely designated by a formerly competent person to make all health care decisions, including life-ending ones, will resolve such questions "in accordance with the principal's . . . wishes" (§ 4684), one

cannot apply the same assumption to conservators and conservatees (cf. § 2355, subd. (a)). For this reason, when the legal premise of a conservator's decision to end a conservatee's life by withholding medical care is that the conservatee would refuse such care, to apply a high standard of proof will help to ensure the reliability of the decision.

■ The function of a standard of proof is to instruct the fact finder concerning the degree of confidence our society deems necessary in the correctness of factual conclusions for a particular type of adjudication, to allocate the risk of error between the litigants, and to indicate the relative importance attached to the ultimate decision. (*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 487 [286 Cal.Rptr. 40, 816 P.2d 892]; accord, *Addington v. Texas* (1979) 441 U.S. 418, 423 [99 S.Ct. 1804, 1807-1808, 60 L.Ed.2d 323].) Thus, "the standard of proof may depend upon the 'gravity of the consequences that would result from an erroneous determination of the issue involved.' " (*Weiner v. Fleischman, supra,* at p. 487, quoting *People v. Jimenez* (1978) 21 Cal.3d 595, 604 [147 Cal.Rptr. 172, 580 P.2d 672].) The default standard of proof in civil cases is the preponderance of the evidence. (Evid. Code, § 115.)[12] Nevertheless, courts have applied the clear and convincing evidence standard when necessary to protect important rights.

We applied the clear and convincing evidence standard, for example, in *Conservatorship of Valerie N., supra,* 40 Cal.3d 143, 168, to ensure that a conservator's decision to authorize sterilization of a developmentally disabled conservatee was truly in the latter's best interests. We have also applied the clear and convincing evidence standard to findings necessary to terminate parental rights (*In re Angelia P.* (1981) 28 Cal.3d 908, 922 [171 Cal.Rptr. 637, 623 P.2d 198]) and to findings supporting the discipline of judges (*Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715]; *Geiler v. Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1]). The Courts of Appeal have required clear and convincing evidence of a person's inability to provide for his or her personal needs as a prerequisite to the appointment of a conservator (*Conservatorship of Sanderson* (1980) 106 Cal.App.3d 611, 615-621 [165 Cal.Rptr. 217]), and of a conservatee's incompetence to accept or reject treatment as a prerequisite to permitting involuntary electroconvulsive therapy (*Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 733 [227 Cal.Rptr. 436]; *Lillian F. v. Superior Court, supra,* 160 Cal.App.3d 314, 324). Similarly, the United States Supreme Court has applied the clear and convincing evidence standard in cases implicating fundamental liberty interests protected by the Fourteenth

---

[12]"Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115 [final sentence].)

Amendment, such as proceedings to terminate parental rights (*Santosky v. Kramer* (1982) 455 U.S. 745, 753, 769-770 [102 S.Ct. 1388, 1394-1395, 1403-1404, 71 L.Ed.2d 599]), to commit to a mental hospital (*Addington v. Texas, supra,* 441 U.S. 418, 425, 432-433 [99 S.Ct. 1804, 1809, 1812-1813]), and to deport (*Woodby v. Immigration Service* (1966) 385 U.S. 276, 285 [87 S.Ct. 483, 487-488, 17 L.Ed.2d 362]).

In this case, the importance of the ultimate decision and the risk of error are manifest. So too should be the degree of confidence required in the necessary findings of fact. The ultimate decision is whether a conservatee lives or dies, and the risk is that a conservator, claiming statutory authority to end a conscious conservatee's life "in accordance with the conservatee's . . . wishes" (§ 2355, subd. (a)) by withdrawing artificial nutrition and hydration, will make a decision with which the conservatee subjectively disagrees and which subjects the conservatee to starvation, dehydration and death. This would represent the gravest possible affront to a conservatee's state constitutional right to privacy, in the sense of freedom from unwanted bodily intrusions, and to life. While the practical ability to make autonomous health care decisions does not survive incompetence,[13] the ability to perceive unwanted intrusions may. Certainly it is possible, as the conservator here urges, that an incompetent and uncommunicative but conscious conservatee might perceive the efforts to keep him alive as unwanted intrusion and the withdrawal of those efforts as welcome release. But the decision to treat is reversible. The decision to withdraw treatment is not. The role of a high evidentiary standard in such a case is to adjust the risk of error to favor the less perilous result. The high court has aptly explained the benefits of a high evidentiary standard in a similar context: "An erroneous decision not to terminate results in a maintenance of the status quo; the possibility of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patient's intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment at least create the potential that a wrong decision will eventually be corrected or its impact mitigated. An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction."[14] (*Cruzan, supra,* 497 U.S. 261, 283 [110 S.Ct. 2841, 2854]; see also *In re Martin* (1995) 450 Mich. 204 [538 N.W.2d 399, 409-411] [requiring, under Michigan law, clear and convincing evidence of a conscious but incompetent conservatee's desire to refuse artificial nutrition and hydration].)

---

[13]Except, of course, when a person has before incompetence left legally cognizable instructions for health care or designated an agent or surrogate for health care decisions.

[14]The court in *Cruzan, supra,* 497 U.S. 261, upheld Missouri's choice of an evidentiary standard; the court did not purport to impose that standard as a matter of federal constitutional law. No such question was presented. Nevertheless, the court's pertinent observations on standards of proof have persuasive value on a question we must decide under California law.

In conclusion, to interpret section 2355 to permit a conservator to withdraw artificial nutrition and hydration from a conscious conservatee based on a finding, by a mere preponderance of the evidence, that the conservatee would refuse treatment creates a serious risk that the law will be unconstitutionally applied in some cases, with grave injury to fundamental rights. Under these circumstances, we may properly ask whether the statute may be construed in a way that mitigates the risk. ■ "If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers." (*Miller v. Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297]; accord, *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628]; see also *San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 581 [7 Cal.Rptr.2d 245, 828 P.2d 147].) ■ Here, where the risk to conservatees' rights is grave and the proposed construction is consistent with the language of the statute, to construe the statute to avoid the constitutional risk is an appropriate exercise of judicial power.

We base our decision on California law. It is nevertheless worth mentioning that no decision of which we are aware has approved a conservator's or guardian's proposal to withdraw artificial nutrition and hydration from a conscious conservatee or ward.

The highest courts of three other states have spoken to the matter. Of these decisions, *In re Martin, supra,* 538 N.W.2d 399, is most like the case before us. Conservatee Michael Martin, like the conservatee here, suffered a head injury in an automobile accident that left him minimally conscious, unable to walk or talk, and dependent on artificial nutrition and hydration. At his highest level of functioning, Michael could move his leg or arm in response to a therapist's request and move his head in response to questions seeking a yes or no answer. On one occasion he indicated "no" in response to the question whether there were ever times when he felt he did not want to go on living; the witnesses, however, disagreed about the consistency and significance of Michael's responses to questions. (*Id.* at pp. 402-403.) The Supreme Court of Michigan, applying that state's common law, did not permit the conservator, Michael's wife, to withdraw artificial nutrition and hydration because clear and convincing evidence did not show he had expressed a

desire to refuse such treatment under his present circumstances. The court adopted the clear and convincing standard for essentially the same reasons we do so here, namely, to ensure that a decision to refuse treatment drawing its legal justification from the conservatee's right to make autonomous medical decisions actually enjoys the conservatee's approval (*id.* at pp. 406-409), and to impose the risk of an erroneous decision on those seeking to withdraw treatment in view of the decision's grave consequences (*id.* at pp. 409-410). "Only when the patient's prior statements," the court held, "clearly illustrate a serious, well thought out, consistent decision to refuse treatment under these exact circumstances, or circumstances highly similar to the current situation, should treatment be refused or withdrawn." (*Id.* at p. 411.) Michael's wife testified that he had demanded she promise not to let him live "like a vegetable" or "on machines" in reaction to movies depicting persons who were vegetative, had terminal illnesses, or could not care for themselves because of serious disabilities. (*Id.* at p. 412.) Michael's coworkers also testified that he had expressed disdain for living in a vegetative state, but they did not understand him as having referred to his present, minimally conscious condition. Considering all this evidence, the court did not find clear and convincing evidence of a "decision to refuse life-sustaining medical treatment under the present circumstances." (*Id.* at p. 413.)

The Supreme Courts of Wisconsin and New Jersey have also refused permission, under their own states' common law, to withhold artificial nutrition and hydration from incompetent but conscious patients. The Wisconsin court required a "clear statement" of the conservatee's desires, proved by a preponderance of the evidence. (*Matter of Edna M.F.* (1997) 210 Wis.2d 557 [563 N.W.2d 485, 490].) The court described the necessary "clear statement" as an exceptional requirement, not applicable to "other, less permanent, decisions," and justified by "the interest of the state in preserving human life and the irreversible nature of the decision to withdraw nutrition from a person." (*Ibid.*, fn. omitted.) Ruling in the case of a woman with Alzheimer's dementia, the court did not find a sufficiently clear statement of the desire to refuse treatment in her predementia comment that she " 'would rather die of cancer than lose [her] mind' "; she had not, the court noted, said anything specifically about withdrawing life-sustaining medical treatment. (*Id.* at p. 487.) The court also specifically refused to extend to conscious patients its earlier decision giving conservators, as a matter of law, the power to withhold life-sustaining treatment from persistently vegetative patients. (*Id.* at pp. 488-490; see *Matter of Guardianship of L.W.* (1992) 167 Wis.2d 53 [482 N.W.2d 60].)

The Supreme Court of New Jersey, articulating that state's common law, adopted a fairly complex three-part test. (*Matter of Conroy* (1985) 98 N.J.

321 [486 A.2d 1209, 48 A.L.R.4th].) Under a "pure-objective test" (*id.* at p. 1232), essentially a best interests test, the court would not require any evidence of the patient's wishes when the patient was in such "recurring, unavoidable and severe pain . . . that the effect of administering life-sustaining treatment would be inhumane." (*Ibid.*) Under a "limited-objective test" (*id.* at p. 1232), the court would permit treatment to be withdrawn for those in "unavoidable pain" of less severity when there is "some trustworthy evidence" the patient would have refused treatment and "it is clear that the burdens of the patient's continued life with the treatment outweigh the benefits of that life for him." (*Ibid.*) In other circumstances, however, the court would permit treatment to be withdrawn only "when it is clear that the particular patient would have refused the treatment under the circumstances involved." (*Id.* at p. 1229.) That standard, the court explained, "is a subjective one, consistent with the notion that the right that we are seeking to effectuate is a very personal right to control one's own life. The question is not what a reasonable or average person would have chosen to do under the circumstances but what the particular patient would have done if able to choose for himself." (*Ibid.*) Under this "subjective test," the court did not find a sufficiently " 'clear' showing of intent" to refuse treatment in a bedridden, severely demented and unresponsive woman's history of scorning medicine and refusing hospitalization. (*Id.* at pp. 1218, 1242-1243.)

About these three decisions one point deserves emphasis: In each case, the court required a clear statement by the patient of the intent to refuse life-sustaining treatment when a conservator or guardian proposed to withdraw treatment from a conscious conservatee or ward *in order to effectuate the latter's own right to refuse treatment.* (*In re Martin, supra,* 538 N.W.2d 399, 406-411; *Matter of Edna M.F., supra,* 563 N.W.2d 485, 488-491; *Matter of Conroy, supra,* 486 A.2d 1209, 1229.) As we have explained, the only apparent purpose of California's statutory language requiring a decision "in accordance with the conservatee's . . . wishes" (§ 2355, subd. (a)) is to enforce the fundamental principle of personal autonomy, in the same way that the identical language in other provisions (§§ 4684, 4714) governing agents and surrogates freely designated by competent persons enforces the principles of agency. While we place no great emphasis on the out-of-state cases, they nevertheless support the fundamental principles that underlie our conclusions, including the imposition of a high standard of proof.

One amicus curiae argues that "[i]mposing so high an evidentiary burden [i.e., clear and convincing evidence] would . . . frustrate many genuine treatment desires—particularly the choices of young people, who are less likely than older people to envision the need for advanced directives, or poor people, who are less likely than affluent people to have the resources to

obtain formal legal documents." But the Legislature has already accommodated this concern in large part by permitting patients to nominate surrogate decision makers by orally informing a supervising physician (§ 4711) and by giving effect to specific oral health care instructions (§ 4670). To go still farther, by giving conclusive effect to wishes inferred from informal, oral statements proved only by a preponderance of the evidence, may serve the interests of incompetent persons whose wishes are correctly determined, but to do so also poses an unacceptable risk of violating other incompetent patients' rights to privacy and life, as already explained. To the argument that applying a high standard of proof in such cases impermissibly burdens the right to determine one's own medical treatment, one need only repeat the United States Supreme Court's response to the same assertion: "The differences between the choice made *by* a competent person to refuse medical treatment, and the choice made *for* an incompetent person by someone else to refuse medical treatment, are so obviously different that the State is warranted in establishing rigorous procedures for the latter class of cases which do not apply to the former class." (*Cruzan, supra,* 497 U.S. 261, 287, fn. 12 [110 S.Ct. 2841, 2855]; see *ante,* p. 536, fn. 9.)

On the same general subject, a group of amici curiae contends as follows: "If this court decides that physicians may not follow a surrogate's instruction to withdraw life-sustaining treatment unless the evidence of the patient's wishes satisfies a 'clear and convincing' standard of proof, many physicians will refuse to do so without judicial approval." But this will not be a valid concern, as we have already explained, in the case of patients who have personally appointed agents or surrogates for health care decisions or left formal instructions for health care, nor in the vast majority of health care decisions, i.e., those less weighty than the decision to withdraw life-sustaining treatment from a conscious patient. The constitutional considerations on which we rely justify applying the clear and convincing evidence standard only when a conservator seeks to withdraw life-sustaining treatment from a conscious, incompetent patient who has not left legally cognizable instructions for health care or appointed an agent or surrogate for health care decisions.

In the case before us, the trial court found that the conservator failed to show "by clear and convincing evidence that conservatee Robert Wendland, who is not in a persistent vegetative state nor suffering from a terminal illness would, under the circumstances, want to die." The conservator does not appear to challenge the trial court's finding on this point; her challenge, rather, is to the trial court's understanding of the law. For these reasons, we need not review the sufficiency of the evidence to support the finding. Nevertheless, given the exceptional circumstances of this case, we note that the finding appears to be correct.

██ The "clear and convincing evidence" test requires a finding of high probability, based on evidence " ' "so clear as to leave no substantial doubt" [and] "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*In re Angelia P.*, *supra*, 28 Cal.3d 908, 919; accord, *Sheehan v. Sullivan* (1899) 126 Cal. 189, 193 [58 P. 543].) ██ Applying that standard here, we ask whether the evidence the conservatee would have refused treatment under the circumstances of this case has that degree of clarity, bearing in mind that what we are asking, in essence, is whether the conservatee would actually have wished to die.

On this point the trial court wrote: "[T]he testimony adduced focuses upon two pre-accident conversations during which the conservatee allegedly expressed a desire not to live like a 'vegetable.' These two conversations do not establish by clear and convincing evidence that the conservatee would desire to have his life-sustaining medical treatment terminated under the circumstances in which he now finds himself. One of these conversations allegedly occurred when the conservatee was apparently recovering from a night's bout of drinking. The other alleged conversation occurred following the loss of conservatee's father-in-law, with whom he was very close. The court finds that neither of these conversations reflect an exact 'on all-fours' description of conservatee's present medical condition. More explicit direction than just 'I don't want to live like a vegetable' is required in order to justify a surrogate decision-maker terminating the life of . . . someone who is not in a PVS [persistent vegetative state]." We agree with the trial court's assessment of the evidence. That assessment is essentially in accord with the only case directly on point, in which the Michigan Supreme Court found no clear and convincing evidence of a desire to refuse treatment under very similar facts. (See *In re Martin*, *supra*, 538 N.W.2d 399, discussed *ante*, at p. 548 et seq.) We add to the trial court's assessment only that Rose acknowledged Robert did not describe the precise condition in which he later found himself (see *ante*, at p. 528) and that, while experts dispute the consistency and accuracy of Robert's responses to questions, it is difficult to ignore the fact that he declined to answer the question "Do you want to die?" while giving facially plausible "yes" or "no" answers to a variety of other questions about his wishes. (See *ante*, at p. 528 et seq.) On this record, we see no reason to hold that the evidence does not support the trial court's finding.

### 2. *The best interest standard*

Having rejected the conservator's argument that withdrawing artificial hydration and nutrition would have been "in accordance with the conservatee's . . . wishes" (§ 2355, subd. (a)), we must next consider her contention that the same action would have been proper under the fallback best interest

standard. Under that standard, "the conservator shall make the decision in accordance with the conservator's determination of the conservatee's best interest. In determining the conservatee's best interest, the conservator shall consider the conservatee's personal values to the extent known to the conservator." (*Ibid.*) The trial court, as noted, ruled the conservator had the burden of establishing that the withdrawal of artificially delivered nutrition and hydration was in the conservatee's best interest, and had not met that burden.

Here, as before, the conservator argues that the trial court applied too high a standard of proof. This follows, she contends, from section 2355, which gives her as conservator "the *exclusive* authority" to give consent for such medical treatment as she "in good faith based on medical advice determines to be necessary" (§ 2355, subd. (a), italics added), and from the decision in *Drabick, supra*, 200 Cal.App.3d 185, 200, which emphasized that a court should not substitute its judgment for the conservator's. The legislative findings to the Health Care Decisions Law, the conservator notes, declare that "[i]n the absence of controversy, a court is normally not the proper forum in which to make health care decisions, including decisions regarding life-sustaining treatment" (§ 4650, subd. (c)); similarly, the Law Revision Commission has explained that "[c]ourt control or intervention in this process is neither required by statute, nor desired by the courts." (30 Cal. Law Revision Com. Rep., *supra*, com. to § 2355, p. 264.) Based on these statements, the conservator argues the trial court has no power other than to verify that she has made the decision for which the Probate Code expressly calls: a "good faith" decision "based on medical advice" and "consider[ing] the conservatee's personal values" whether treatment is "necessary" in the conservatee's "best interest." (§ 2355, subd. (a).) The trial court, as noted, rejected the conservator's assessment of the conservatee's best interest but nevertheless found by clear and convincing evidence that she had acted "in good faith, based on medical evidence and after consideration of the conservatee's best interests, including his likely wishes, based on his previous statements." This finding, the conservator concludes, should end the litigation as a matter of law in her favor.

The conservator's understanding of section 2355 is not correct. To be sure, the statute provides that "the conservator shall make the decision in accordance with *the conservator's determination* of the conservatee's best interest." (§ 2355, subd. (a), italics added.) But the conservator herself concedes the court must be able to review her decision for abuse of discretion. This much, at least, follows from the conservator's status as an officer of the court subject to judicial supervision. While the assessment of a conservatee's best interest belongs in the first instance to the conservator,

this does not mean the court must invariably defer to the conservator regardless of the evidence.

In the exceptional case where a conservator proposes to end the life of a conscious but incompetent conservatee, we believe the same factor that principally justifies applying the clear and convincing evidence standard to a determination of the conservatee's wishes also justifies applying that standard to a determination of the conservatee's best interest: The decision threatens the conservatee's fundamental rights to privacy and life. While section 2355 is written with sufficient breadth to cover all health care decisions, the Legislature cannot have intended to authorize every conceivable application without meaningful judicial review. Taken to its literal extremes, the statute would permit a conservator to withdraw health care necessary to life from any conservatee who had been adjudicated incompetent to make health care decisions, regardless of the degree of mental and physical impairment, and on no greater showing than that the conservator in good faith considered treatment not to be in the conservatee's best interest. The result would be to permit a conservator freely to end a conservatee's life based on the conservator's subjective assessment, albeit "in good faith [and] based on medical advice" (§ 2355, subd. (a)), that the conservatee enjoys an unacceptable quality of life. We find no reason to believe the Legislature intended section 2355 to confer power so unlimited and no authority for such a result in any judicial decision. Under these circumstances, we may properly construe the statute to require proof by clear and convincing evidence to avoid grave injury to the fundamental rights of conscious but incompetent conservatees. (See *ante*, at p. 546 et seq.)

We need not in this case attempt to define the extreme factual predicates that, if proved by clear and convincing evidence, might support a conservator's decision that withdrawing life support would be in the best interest of a conscious conservatee. Here, the conservator offered no basis for such a finding other than her own subjective judgment that the conservatee did not enjoy a satisfactory quality of life and legally insufficient evidence to the effect that he would have wished to die. On this record, the trial court's decision was correct.

## III. CONCLUSION

For the reasons set out above, we conclude the superior court correctly required the conservator to prove, by clear and convincing evidence, either that the conservatee wished to refuse life-sustaining treatment or that to withhold such treatment would have been in his best interest; lacking such evidence, the superior court correctly denied the conservator's request for

permission to withdraw artificial hydration and nutrition. We emphasize, however, that the clear and convincing evidence standard does not apply to the vast majority of health care decisions made by conservators under section 2355. Only the decision to withdraw life-sustaining treatment, because of its effect on a conscious conservatee's fundamental rights, justifies imposing that high standard of proof. Therefore, our decision today affects only a narrow class of persons: conscious conservatees who have not left formal directions for health care and whose conservators propose to withhold life-sustaining treatment for the purpose of causing their conservatees' deaths. Our conclusion does not affect permanently unconscious patients, including those who are comatose or in a persistent vegetative state (see generally *Conservatorship of Morrison, supra*, 206 Cal.App.3d 304; *Drabick, supra*, 200 Cal.App.3d 185; *Barber, supra*, 147 Cal.App.3d 1006), persons who have left legally cognizable instructions for health care (see §§ 4670, 4673, 4700), persons who have designated agents or other surrogates for health care (see §§ 4671, 4680, 4711), or conservatees for whom conservators have made medical decisions other than those intended to bring about the death of a conscious conservatee.

The decision of the Court of Appeal is reversed.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

The petition of both appellants for a rehearing was denied September 26, 2001.