Filed 7/20/21 In re B.R. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.R. et al., Persons Coming Under Juvenile Court Law. | B307796 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP03816A) |
| Plaintiff and Respondent, | |
| v. | |
| J.C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Objector and Appellant.

No appearance by Plaintiff and Respondent.

————————————

J.C. (mother) appeals an order removing her infant daughter B.R. (daughter) from parental custody under Welfare and Institutions Code section 361, subdivision (c), after the juvenile court declared daughter a dependent based on domestic violence between mother and A.R. (father).[1] Mother contends the removal order is unsupported by substantial evidence. The Department of Children and Family Services (Department) did not recommend removing daughter from mother's custody and did not file a respondent's brief in this appeal.[2] Finding sufficient evidence to support the court's removal order, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Consistent with our standard of review, we state the facts in the light most favorable to the juvenile court's findings, resolving all conflicts and drawing all reasonable inferences to uphold the court's order, if possible. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Mother and father both have children from prior relationships, as well as prior dependency proceedings based on domestic violence with their previous partners.[3] Daughter (born December 2019) is the only child mother

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code. Father is not a party to this appeal.

[2] The case is before us on mother's opening brief only. The Department submitted a letter indicating that, as it had recommended daughter remain placed with mother, it "is not the appropriate respondent." It took no position on the appeal. No other party filed a respondent's brief.

[3] The other children were not named in the dependency petition in this case.

and father have in common.  The Department began investigating possible risk to daughter's safety in June 2020, after both parents were taken into custody following a domestic violence incident between them.

## 1.    *Half-siblings and prior dependency proceedings*

In 2016, mother's two older sons (born 2013 and 2015) were declared dependents based on the risk posed by ongoing domestic violence between mother and the boys' father.  The case was closed in 2018 with a custody order granting mother full custody and the boys' father monitored visitation.

Father's oldest son (born 2012) was declared dependent in 2015, also based on domestic violence.  Father's reunification services were terminated in 2017, and the child was placed in a legal guardianship with a maternal relative.  The relative reported father maintains consistent weekend visits with the child, monitored by paternal grandmother.  Father's younger son (born 2015) remains in the custody of the son's mother, with no dependency proceedings involving the child.  Father reported he pays child support and visits regularly.

## 2.    *Relationship between mother and father*

Mother and father were in a relationship for several years, and sometime prior to daughter's birth, father moved into mother's family home, where mother and her two sons lived together with maternal grandmother and two maternal uncles.  According to maternal uncle, father was initially respectful, but became increasingly verbally aggressive towards mother over time.

Father moved out of mother's family home in April 2020, for reasons that are unclear from the record. According to maternal uncle, maternal grandmother evicted father due to his aggressive behavior and use of foul language. According to mother, father wanted to help paternal grandmother. According to father, he wanted to save money by living with his own family, because he was in the process of relocating to Baltimore.

On April 10, 2020, police investigated a domestic battery radio call and spoke with father; mother was not present. Father reported that he and mother had separated approximately a week earlier, and were having an ongoing custody dispute over daughter, who was four months old at the time. While daughter was in his custody, he and mother had a verbal argument. Mother struck his face and her nails caused visible injuries. The police observed scratch marks and redness on father's face, but he refused to be photographed and refused to provide additional information. Father did not want mother (who was not present) to be arrested. Describing the incident during a later interview with a Department investigator, father showed the investigator a photo with three scratch marks on the right side of father's face, extending from his forehead down to the cheek line, and various small red marks. Father reported daughter was in the bedroom sleeping when mother assaulted him.

On June 10, 2020, a second incident resulted in both mother and father being taken into police custody. According to the police report, mother called for police assistance after father physically assaulted her. Mother was in front of father's building when the police arrived. She told police that she and father became involved in a verbal dispute over the status of their dating relationship. Mother did not want to argue, so she asked father if she could pick up daughter and leave. Father became visibly upset and began to physically assault mother, dragging

4

her by the hair and punching her in the face, causing visible bruising to her lips. Mother was reluctant to provide any additional information to police, including whether mother and father have a history of domestic violence. Mother stated she just wanted to take her daughter and leave. The officers interviewed father separately. He told them about his prior police report against mother for domestic battery, and denied assaulting mother, claiming instead that she had injured herself. Ultimately, the police took both mother and father into custody.

### 3.    *The Department's Initial Investigation*

On June 12, 2020, the Department received a referral concerning daughter, claiming that father was keeping daughter away from mother and tried to convince mother to sign a notarized letter allowing father to take daughter out of state. When mother did not agree, father claimed that he needed to use "substances" because of mother, and he physically assaulted mother. Both parents were arrested, and mother was unable to pick up daughter, who had been left with paternal grandmother.

A social worker inspected mother's home and interviewed mother on June 18, 2020. The home was clean with plenty of food, and daughter was healthy and clean. Mother stated that father was trying to move to Baltimore and there was no custody arrangement regarding daughter. Mother claimed father had made a false report regarding the April 2020 incident. Mother agreed the June incident occurred, but minimized it, suggesting father had been trying to shove her out and his hand ended up hitting her face. She denied any prior history of domestic violence with father, claiming this was the first time she and father had ever argued. Mother was willing to participate in an Up

Front Assessment.  Her boys, daughter's half-siblings, both said they had never seen mother and father fight.

In a separate interview, father denied ever hitting or hurting mother.  He claimed he knew not to get involved in domestic violence due to his past experience.  He has anxiety and uses marijuana occasionally to sleep.  Father told the social worker mother had a lot of jealousy, was indecisive about their relationship, and always brought up his prior relationship.  When asked if he would participate in an Up Front Assessment and obtain services, father denied needing services and stated he would think about participating in the assessment.

The social worker met with mother and father separately again in early July to advise them that the Department would be seeking to detain daughter from father's custody.  When asked if she would be willing to cooperate in services in order to keep daughter in her care, mother agreed.  Father told the social worker he "agrees with an open case in court," and also wanted a determination of whether child was truly his.  Father initially agreed to drug test, but later said he would only agree to drug test if mother drug tests as well, claiming that mother also uses marijuana.

On July 15, 2020, the social worker called maternal grandmother and asked if she had any concerns regarding the parents' care of daughter.  Maternal grandmother said father is jealous and possessive of mother, but he also does not get along with mother.  He would come and take daughter away from mother.  Maternal grandmother did not want him coming back and starting trouble.

4.    *Detention and petition*

In July 2020, the court authorized the Department to remove daughter from father's custody.  The Department filed a petition

alleging under section 300, subdivisions (a) (physical abuse), (b) (neglect/failure to protect), and (j) (sibling abuse or neglect) that the parents had a history of violent altercations in the presence of child, specifically, the June 10 incident in which father struck and shoved mother. The petition also alleged that child's half-siblings from both parents had previously been declared dependents due to domestic violence. The court released daughter to mother under Department supervision, with family maintenance services. The court ordered monitored visitation for Father; the visits were not to occur at mother's home, and mother was not to act as the monitor for father's visits.

At the July 22, 2020 detention hearing, the court ordered the Department to provide family maintenance services and referrals as appropriate, and to file a jurisdiction and disposition report in just over one month, on August 28, 2020.

5. *Jurisdiction and disposition report*

The social worker met with mother on August 18, 2020. Mother confirmed she was aware that father's visits with daughter were to be monitored by someone other than mother in a neutral setting, but she had not allowed father to visit daughter, explaining that mother did not want to mess it up and worried the Department would find an excuse to take away her children.

Mother minimized the June 10 incident and continued to deny any history of domestic violence with father. Mother claimed she was being protective by calling the police on June 10, 2020 when father had hit her, but then regretted making the call, stating "I knew DCFS gonna come as soon as the cops showed up. I didn't want this to happen. I just wanted to scare him [father] because I was scared too." She reported falling, but did not recall whether she tripped or father

7

pushed her.  She also waffled on whether father intended to hit her or was trying to help her up after she tripped, stating "I don't think he really tried to hit me.  I probably overreacted."  When asked if she intended to file a restraining order against father, she saw no need to do so, saying "He doesn't bother me."  When asked whether father has ever used the children as leverage to threaten mother, she responded, "No.  He's too scared to do anything."

Mother's relatives undermined mother's efforts to minimize the seriousness of domestic violence between the two, explaining that the parents had a turbulent relationship and yelled at each other frequently (often within earshot of mother's boys).  Mother's oldest son said he had seen mother and father yelling really loud and he "worries [father] will hit my mommy and mommy will hit him back."   A maternal uncle described father's increasing verbal aggression against mother; maternal uncle also said he had seen bruises on mother's arms, which he believed father had caused.  Maternal uncle was concerned about mother resuming her relationship with father, despite the family having voiced their concerns.  When asked what services might help the parents, the maternal uncle said "they need counseling for sure.  They can't keep going back and forth.  It's toxic."

Mother insisted she had a loving relationship with father, and the only source of their arguments was father's relationship with the mother of father's oldest son.  According to mother, she and father were planning to relocate to Baltimore with mother's three children to start a new life.  When the social worker asked mother if she has a plan to address case concerns, mother responded "Yes, I can do co-parenting if he wants to, but I think we are fine."  She agreed that she could be helped by counseling.  Mother had not enrolled in any services, opting to wait for a court order because she did not know whether to take perpetrator or victim classes.

In a separate interview on August 18, 2020, father told the social worker initially that mother was playing games and not letting him see daughter. Father also reported an increase in relationship problems over the past year after he learned she cheated on him. He claimed mother was using the domestic violence accusations to get him arrested, and showed the social worker text messages supporting his claim. [4] Father expressed an interest in reunifying with child, but was unsure whether he wanted a relationship with mother. He believed he had matured and wanted to move on. He was reluctant to speak more about his relationship with mother, but acceded to the social worker's suggestion that he provide a written statement if he wished.

The following week, father sent the investigator an e-mail which he wanted included in the Department's report. In his e-mail, father accused mother of cheating with her boys' father and plotting to frame him (father) for domestic violence. He also explained that, after the domestic violence incident (which he continued to deny), "we've seen each other a lot and I slept over at her house for two weeks straight, . . . ."

In a section of the Department's report titled "Child(ren)'s Safety In Home," the Department found significant child safety concerns, stating "the child['s] safety cannot be ensured without the Departmental oversight." Citing the domestic violence incidents between the parents and their respective histories in previous relationships, the Department found that daughter's "safety cannot be ensured in the home of parents until they demonstrate substantial progress towards the recommended case plan," which would include parenting, domestic violence classes, and individual counseling.

---

[4] Father showed the investigator an e-mail from mother dated August 20, 2020, stating, "Can you come please ima stay alone with the kids."

The Department's report included the following summary: "Although the Department does not have any immediate child safety concerns for the child being released to the mother's care and custody, the Department remains concerned as to her ability to protect the child. Per the maternal uncle, the mother has a history of 'going back' to be in a relationship with the father, despite the family having voiced their concerns with the mother after he observed the mother had multiple unexplained bruising on her person. [¶] Further, despite the [Department]/Court involvement, the father admitted that the mother had brought the child to his family home and was allowing him to have unmonitored visit [*sic*] with the child after the Department had already detained the child from his care and custody."

The Department's report noted that despite being aware of the conditions for father's monitored visitation, mother had both refused to permit visitation and also brought daughter to father's home after the court removed her from father's custody. The Department asked the court to admonish parents for their violations of the visitation order. The Department recommended the court find the petition true, bypass father's reunification based on his earlier failure to reunify with his oldest son, and order family maintenance services for mother, keeping daughter placed with mother. The Department advised, "if the Court terminates its jurisdiction with a Family Law Order, the mother will most likely allow the father to return to the home, as she expressed a strong desire to remain in the relationship. Neither parent has taken an active role in addressing the case concerns and have failed to enroll in any services." The Department recommended co-parenting and domestic violence classes, with a 52-week certified program to address mother's aggression when resolving conflicts.

## 6.     *The Adjudication/Disposition Hearing*

On September 17, 2020, the court conducted a combined jurisdiction and disposition hearing, admitting the Department's reports and two photos from father into evidence. No additional evidence or testimony was offered, and the parties proceeded to argument.

Minor's counsel argued that the petition should be sustained and sought reunification for both parents. Each parent's counsel argued for the petition to be dismissed for insufficient evidence; mother's counsel asked that child be placed with mother; father's counsel asked that child be placed with father. Mother's counsel objected to a 52-week domestic violence program, arguing mother was a victim not a perpetrator. The Department reviewed evidence from the jurisdiction report and argued to sustain the petition, based on the toxic relationship between mother and father, and their failure to learn from their previous court cases. Regarding disposition, the Department asked for father to not receive reunification services. The court responded that if the Department was recommending placing minor with mother, there was no "bypass" under section 361.5 for enhancement services.

Before sustaining the petition allegations, the court asked minor's counsel, "Did I hear you right, did you say that this child should be removed from both parents?"[5] Minor's counsel disagreed,

[5] According to the reporter's transcript of the hearing, the Department interjected to say "The Department's recommendation is to stay with father." Despite the word "father" appearing in the transcript, we understand from the balance of the record on appeal that the Department recommended placing daughter with mother, not father.

11

stating, "No. [¶] I did not have a recommendation for the minor to be removed from both parents." The court responded, "Well I'm of a mind this child should be removed from mother." After sustaining the petition, the court found by clear and convincing evidence that there was substantial danger to child if she remained in mother's home. The court reasoned that this was not the first incident, and mother continued to return to father and to minimize and deny the domestic violence in her relationship with father. Mother was backpedaling, initially claiming father had hit her, then saying she might have fallen and run into father's hand. Mother had previously been through a domestic violence victim program, but had not gained any insight, staying in the relationship and making excuses for father, the same person she had previously accused of pulling her by the hair. The baby was young, mother would not comply with a restraining order, and there were no measures that could be put into place to allow daughter to remain in the home. As to father, the court also found clear and convincing evidence that returning daughter to his custody would be detrimental under section 361, subdivision (c). The court summed up that both parents were backpedaling, making excuses, and seeking to cover up their behavior. "Neither parent is protective against the other, and the court has no confidence, based on their past performance, that either parent is going to stay away from the other." The minute order also stated the court found that the Department "made reasonable efforts to prevent removal but there are no services available to prevent further detention."

The court ordered reunification services and monitored visitation for both parents, declining the Department's recommendation to bypass reunification services for father. Mother's counsel objected to the removal order and asked for daughter to be placed with a relative; the

court granted the Department discretion to do so. Mother filed a timely notice of appeal.

## *DISCUSSION*

Mother contends there was insufficient evidence to support the court's determination, by clear and convincing evidence, that daughter was at risk of serious physical harm and there were no reasonable means to keep daughter safe without removing her from mother's custody. We disagree.

### 1. *Governing law and standard of review*

"'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 265; *In re D.C.* (2015) 243 Cal.App.4th 41, 51, 54; see § 361, subd. (c)(1).) When determining whether a child will be in substantial danger if permitted to remain in the parent's physical custody, the juvenile court must consider, "not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 (*I.R*).) The juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove

13

the minor is based." (§ 361, subd. (e).)  The California Rules of Court also require the court to determine and make a finding as to "whether reasonable efforts to prevent or eliminate the need for removal" were made by the Department.  (Rule 5.695(d).)  "The parent need not be dangerous and the minor need not have been harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)

"Even if a child suffers no physical harm due to domestic violence, a 'cycle of violence between . . . parents constitute[s] a failure to protect [a child] "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." [Citations.]' [Citation.]  A parent's denial of domestic violence increases the risk of it recurring.  [Citations.]" (*In re V.L.* (2020) 54 Cal.App.5th 147, 156.)

In determining whether substantial evidence supports the juvenile court's dispositional findings, we must account for the clear and convincing standard of proof.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)  The question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Ibid.*)  As with our review of the court's jurisdictional findings, we "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011–1012.)

## 2. *Evidence Supporting Removal Order*

Mother and father's statements and actions, particularly when considered against the backdrop of their respective domestic violence histories, provide substantial evidence that if mother retains custody of daughter and also maintains contact with father, there is substantial risk of ongoing domestic violence, placing daughter at risk of harm. Past violence in a relationship is a good predictor of similar behavior in the future. (*In re V.L., supra,* 54 Cal.App.5th at p. 156; *In re T.V.* (2013) 217 Cal.App.4th 126, 136.)

Mother argues that the Department found her to be sincere in her desire to keep daughter in her custody. But that desire does not undermine the juvenile court's focus on evidence of the daughter's young age and both parents' actions and statements backpedaling the seriousness of the prior domestic violence incidents to conclude that removal was warranted. Here, there is evidence that mother sought to reestablish her relationship with father, delayed enrolling in a domestic violence program, declined to obtain a restraining order, and violated the court order limiting father to monitored visitation with someone other than mother as the monitor. All of these actions support the juvenile court's finding that daughter was at risk of exposure to future domestic violence.

There is also sufficient evidence to support the court's determination that no reasonable means exist to protect child other than removal. The Department provided both parents with referrals to services, but neither parent had enrolled. The Department's report also documented that parents not only violated the prior court orders limiting father to monitored visits, but that both initially sought to hide that fact from the Department and the court.

15

While mother expressed a willingness to engage in services, her statements evidenced a troubling lack of insight into the dangers posed by domestic violence. At the same time that mother was confidently stating that she and father were in a loving relationship and planned to move to Baltimore as a family, she also acknowledged that father had failed to comply with court requirements to reunify with his older son, daughter's half-sibling, and sought to minimize and excuse father's inability or unwillingness to comply with services, stating "it's just how he is. He gets frustrated when you [try] to tell him to do things."

The Department reported that the case issues that brought daughter to the court's attention had yet to be resolved, and that her safety could not be ensured in the parents' home until they demonstrated substantial progress in the case plan, including completing parenting and domestic violence classes and individual counseling. Despite both parents having prior dependency cases involving domestic violence with different partners, "mother and father have failed to apply what they have learned from their previous Court case and continued engaging in domestic violence in their current relationship."

The evidence in the Department's jurisdiction and disposition report constitutes substantial evidence supporting the removal order. The fact that the Department recommended placing daughter with mother does not overcome the substantial evidence presented to the trial court supporting its finding, under the clear and convincing standard, that the requirements for removal under section 361, subdivision (c), had been met. The record before us amply demonstrates that there was ongoing tension between mother and father regarding the future of their relationship and custody of daughter. Absent persuasive evidence that mother had demonstrated awareness of the cycle of domestic violence, and absent mother's

16

willingness to take sufficient steps to prevent such violence, mother's continued contact with father would have placed daughter at risk of harm.

## *DISPOSITION*

The dispositional order removing daughter from mother is affirmed.


MOOR, J.


I CONCUR:


KIM, J.

### *In re B.R. / Los Angeles County Department of Children and Family Services v. J.C. - B307796*

RUBIN, P. J. – DISSENTING:

I respectfully dissent. I find my answer to the question put to this court largely compelled by our Supreme Court's recent decision in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*).

At the adjudication/disposition hearing, the Department recommended placing the child with mother. California Rules of Court, rule 5.690(a)(1)(B) requires the Department to include in its report a discussion of the reasonable efforts it made to prevent or eliminate removal, but this is required only if the Department recommends removal. As the Department did not recommend removal, it included no such discussion. The record did not include a formal statement that described services mother had received in the earlier dependency proceedings involving her older children and what lessons she may have learned. The record does reflect that at one point, the Department investigator "asked the mother if she could identify the cycle of abuse, Incident, Reconciliation, Calm, and Tension building and she said, 'I remember the counselor told me something like that before.'" This was the sole reference to any counseling mother received or any domestic violence program she may have previously attended. In explaining the reasons for removal, the juvenile court stated that mother "previously had a D.V. victim program" and had "been through D.V. counseling, as a victim." But no detail was forthcoming, and the notion that a domestic violence victim, who had been in a program before, might again be the victim of domestic violence without losing custody of her

children is not remarkable.  Nor is it a particularly strong reason for removing a child in the absence of information why reasonable efforts to avoid removal would not have been successful.

Echoing the Department, child's counsel did not recommend removal.  Nor, obviously, did mother's attorney.  In response to this near stipulation for child to remain with mother, with services, the trial court instead found removal necessary, without questioning the Department on a plan it might have to assure the child's safety in mother's home.

The record indicates mother was a good parent to child, and child was safe in her care.  The danger potentially posed to child was that mother appeared trapped in a cycle of domestic violence with father, and, like many other victims, was in denial.  This is not to say that a child may never be removed from a domestic violence victim.  But, here, father no longer lived in the home, and there were several relatives who could help ensure that mother, father, and child were not together in violation of court orders.  Counseling, parenting, and domestic violence classes were scheduled.  Unannounced visits by the Department could confirm compliance.

Appellate courts do not typically reverse on the grounds of insufficiency of the evidence to support a removal order.  This is so because most often the issue is fully litigated with – and again, typically – the parents and the Department taking conflicting positions.  Each side customarily provides legally sufficient evidence to support its position, and the juvenile court is within its authority to accept one version over the other, or some combination of the two.  In such situations, the appellate court

will give honored deference to the juvenile court, apply the substantial evidence standard of review, and affirm.

The underpinning for that deference has been somewhat altered by our Supreme Court's decision in *O.B.* There, the court addressed the proper application of substantial evidence review in the appellate court for those cases in which the burden of proof in the trial court was clear and convincing evidence, as it was here. In a prior opinion, the Supreme Court had explained why our legal system employs more than one burden of proof -- most commonly, preponderance of the evidence, clear and convincing evidence, or beyond a reasonable doubt. "The function of a standard of proof is to instruct the fact finder concerning the degree of confidence our society deems necessary in the correctness of factual conclusions for a particular type of adjudication, to allocate the risk of error between the litigants, and to indicate the relative importance attached to the ultimate decision." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546; see also *O.B., supra,* 9 Cal.5th at p. 998.) For clear and convincing evidence, "'the proponent must convince the jury or judge, as the case may be, that it is *highly probable* that the facts which he asserts are true. He must do more than show that the facts are probably true.' (Comment, *Evidence: Clear and Convincing Proof: Appellate Review* (1944) 32 Cal. L.Rev. 74, 75.)." (*O.B., supra,* 9 Cal.5th at pp. 998–999.)

Prior to the high court's resolution of the issue in *O.B.,* appellate courts had disagreed on how to apply substantial evidence review to findings which had been established by clear and convincing evidence. Some courts took the position that our review must determine if there was substantial evidence of the existence of clear and convincing proof. (E.g., *In re Basilio T.*

3

(1992) 4 Cal.App.4th 155, 170.)  Many courts employed the "disappearing" standard.  "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.  Thus, on appeal from a judgment required to be based upon clear and convincing evidence, the clear and convincing test disappears and the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1525–1526 [internal quotes and citations omitted].)

After *O.B.,* the "disappearing" standard itself has disappeared from our appellate jurisprudence.  Our Supreme Court held that, "when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder *could have found it highly probable that the fact was true.*"  (*O.B., supra,* 9 Cal.5th at pp. 1011–1012; italics added.)  The court expressly rejected the notion that the clear and convincing burden of proof in the trial court has no effect on appellate review for sufficiency of the evidence.  (*Id.* at p. 1010 & fn. 7.)

I agree with my Division 2 colleagues who recently concluded that the proper application of the *O.B.* standard in a case where a child was removed from a parent due to domestic violence is to ask whether "a reasonable trier of fact could have found it *highly probable* that placement of [the child] with [the parent] would pose a substantial risk of [the child] being harmed

4

by exposure to future domestic violence, and that there were no reasonable means to protect [the child] without removal from [the parent's] physical custody." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156–157 (*V.L.*); italics added.) The *V.L.* court applied the *O.B.* standard in affirming the order removing the child. In *In re I.R.* (2021) 61 Cal.App.5th 510, 521–522, Division 1 of this court applied the substantial evidence/clear and convincing standard of review to reverse a removal order. It held that whether substantial evidence supported the removal order in that case depended on whether there is substantial evidence domestic violence will continue if the child is returned home. The analysis is to be informed by the clear and convincing standard and the general premise in favor of keeping children with their parents while proceedings are pending, whenever safely possible.[6]

The majority opinion points to admittedly troubling evidence that does not speak well of mother – she was resistant to terminating her relationship with father, had minimized the domestic violence between the two, and, like father, had experienced domestic violence in other relationships. But it was undisputed that, at the time of removal, mother and father did not reside in the same home. Instead, each lived with relatives who could help provide support. I find it also telling that, between the court's release of the child to mother at the detention

---

[6] *O.B.* was a conservatorship case, not a dependency proceeding. The Supreme Court made it clear, however, that the principle it announced was broad and applied to dependency matters. As the court observed in *V.L.*, "In a footnote, *O.B.* disapproved of a host of dependency cases to the extent that they are inconsistent with *O.B.*'s holding. (*O.B.*, *supra*, at p. 1010, fn. 7.)" (*V.L., supra,* 54 Cal.App.5th 147, 155.)

hearing on July 22, 2020, and the removal of the child on September 17, 2020, at the adjudication/disposition hearing, the Department did not report further incidences of domestic violence. In recommending release of the child to mother, the Department reported that mother and child were well bonded. Mother's house was clean, with plenty of food.

I suspect appellate courts will be wrestling with the application of the *O.B.* standard of review in clear and convincing cases for some time. The process, although well-articulated, is a bit abstract. I may very well have agreed to an affirmance if the order had been governed by the preponderance of the evidence burden of proof. But I cannot say on this record that the evidence showed it was highly probable that the child will be exposed to additional acts of domestic violence and that there are no means to protect child, if child is placed in mother's custody.

I would reverse the court's order removing child from mother.


RUBIN, P. J.